## WATKINS AND TRAPNALL VS. WASSELL.

The lien of a judgment on real estate is not displaced in favor of subsequent liens or contracts by the mere delay of the judgment creditor to sue out execution: nor by an order of the plaintiff, to return the execution without a levy, or without a sale of the property levied upon.

Where a minor executes a deed of conveyance of real estate, and, upon arriving at age, jointly with his grantee, executes a deed of mortgage, to secure a debt of the grantee: such act is an affirmance of the deed of conveyance.

The owner of a house and lot, being in possession, contracts with a mechanic for repairs, and grants the rents and profits to accrue, in payment thereof: the attorney of a judgment creditor, whose lien is prior to the contract for repairs, with full knowledge of all the facts, sues out execution, while the work is in progress, and purchases the house and lot: *Held* That he must pay for such repairs as were put upon the house, after his purchase, until he gave notice to the contractor that he would not be responsible or pay for the work.

A contract with a mechanic for the repair of a house, that he shall receive the rents until he is fully paid, is not a mere security for the payment, but a transfer or grant of the rents and profits.

If one sells and conveys real estate, to which he has no title, or an imperfect title, at the time of the sale, and subsequently acquires a perfect title, it enures to the benefit of the grantee; and, if between the date of the conveyance and the acquisition of the perfect title, a judgment is rendered against the grantor, the title of the grantee is prior to the lien of the judgment.

The interest of a judgment creditor, under his lien, in the real estate of the debtor, is limited to the actual interest of the debtor at the time the lien attaches, and he holds it free from subsequent alienations or incumbrances, but subject to all prior alienations or incumbrances.

10BB

*Appeal from Pulaski Circuit Court in Chancery.*

Hon. WILLIAM H. FEILD, Circuit Judge.

This cause was argued and submitted at the January term, 1851.

On the 13th February, 1854, the Court, the Hon. C. C. SCOTT, and Hon. DAVID WALKER, Judges, and Hon. ISAAC STRAIN, Special Judge, rendered a decree reversing that of the Circuit Court. Opinions were delivered by the Hon. DAVID WALKER, in which Mr. Justice Scott concurred, and by the Hon. ISAAC STRAIN.

The Court having adjourned over until April, at which time Judge STRAIN was not present, a petition for reconsideration was filed and granted: and an opinion delivered on the 4th of May, differing materially, as to one point, from the previous opinion of the majority of the Court. The opinion of Judge STRAIN contains a substantial statement of the facts of the case.

WATKINS & CURRAN. The judgment of Jones, Woodward & Co., under which Watkins purchased, was rendered on the 24th June , 1840, and revived by scire facias, sued out before the expiration of the lien, and his title is free from any incumbrance of Wassell's contract, entered into in November, 1843. (*Secs.* 8, 13, *Ch.* 93, *Dig.; Bolls et. al. vs. Hubbard,* 2 *Eng.* 442.) And so under the judgment of Pitman & Co., rendered the 10th November, 1840, and revived by scire facias.

The judgment lien on land, unlike that of the lien on personal estate, or where the judgment is not a lien per se, is unaffected by the circumstance of the plaintiff not proceeding to enforce it until a subsequent lien has been obtained. *Rankin vs. Scott,* 12 *Wheat.* 177; *Trapnall vs. Waterman,* 13 *Ark; 1 Brock.* 168; 2 *Wash. C. C. R.* 280.

Judgments rendered against a minor are voidable merely, not void; and if not avoided by him, after he comes of age, they re-

main valid and binding. 1 *Am. Lead. Cas.* 86 *et. seq.;* 3 *Bacon* 596; *Cro. Jac.* 465; 2 *Bibb Rep.* 101; 3 *Marsh. R.* 354; 14 *J. R.* 422.

The Bank having purchased the lots upon which she held a mortgage, the latter was merged, (11 *Mass.* 50; 7 *Mon.* 101; 1 *Wend.* 478;) and by the sale, under the judgment of the United States against the Bank, the purchaser acquired title discharged from the mortgage.

Wassell's claim must either be a mortgage lien, or a mechanic's lien: it is not good as a mortgage, because his contract was never recorded, (*Dig., Ch.* 110, *Secs.* 1, 2; *Main et. al. vs. Alexander*, 4 *Eng.* 112;) nor as a mechanic's lien, because he did not complete the repairs, so as to put the house in a condition to be rented, and a lien commences only from the completion of the work, (*McCullough vs. Caldwell*, 3 *Eng.* 231;) and because he took a distinct security, a lien upon the rents, and in such cases, a mechanic's lien does not attach. 14 *Wend.* 201; 2 *Kent Com.* 500; 16 *Ves.* 4, 275; 9 *Cow.* 52; 1 *Mason* 191; 4 *Wheat* 255.

No fraud can be imputed to the plaintiffs in the judgments, nor their attorneys, for not preventing the repair of the buildings. The lien of their judgments was of record; Wassell had notice of it; and they had no right or power to prevent the repairs by Byrd, or any one whom he might employ.

TRAPNALL insisted that, at the date of the judgment of Trapnall & Cocke, which was prior to the contract of Wassell, William J. Byrd was the owner in fee of the lots sold under that judgment: that, by the purchase under the execution, Trapnall became the owner of the lots, free from all subsequent encumbrances: that, by the sale of the lots to the Bank, the fee simple vested in the Bank, and the prior mortgage was merged: that, no party can convey any estate in land during the existence of a judgment lien, so as to defeat the lien: that, the contract between Wassell and Byrd and the Bank, are personal obligations, not importing the grant or conveyance of the land, or of any interest in it, and

would not affect a purchaser with or without notice: that, as against Trapnall, no equity is shown by the bill on its face.

PIKE, for the appellee. The interest of Wassell was not "a lien upon rents," but an assignment or grant of rents, (*Woodfall, Land. & Ten.* 102; 1 *Hill, ab.* 154, 159, 162; 2 *Ib.* 309;) and the grant carried with it the right of possession.

The lien of a judgment is displaced by the lien of a levy under *fi. fa.,* (8 *Ark.* 389; 4 *Cow.* 417; 8 *Yerg.* 460;) and the lien of the judgment cannot be revived until the levy is disposed of.

The lien of the several judgments, under which the appellant's claim, was postponed to the Bank mortgage and to Wassell's claim, by the neglect of the plaintiffs to enforce their liens. *Bliss vs. Ball,* 9 *J. R.* 132; *Kellog vs. Griffin,* 17 *J. R.* 274; 3 *Cow.* 272; 5 *Ib.* 390; 7 *Ib.* 560; 21 *Wend.* 222; 4 *How. Miss. R.* 130; 7 *Ib.* 377; 11 *Sm. & Mar.* 249; 2 *Dev.* 354; 4 *Ib.* 128.

But, admitting all the judgment liens to have been prior, still for these parties to defend against Wassell's claim, is most inequitable. The judgments were permitted to lie dormant: the parties stand by and permit the mortgage to the Bank to be made, and Wassell to make his contract, and go on and expend his work upon the buildings, and when, by his labor, they are rendered of value, they assert their judgment lien, upon which they had rested until a *sci. fa.* was necessary to revive them. 11 *N. Hamp.* 201; 17 *Verm.* 449; 8 *Shep.* 130; 19 *Wend.* 557; 21 *Ib.* 172; 2 *Dev.* 179; 4 *Ib.* 172; 1 *Story's Eq., Sec.* 385; 1 *J. C. R.* 344; 6 *J. C. R.* 168.

Opinion of Hon. ISAAC STRAIN, Special Judge.

This is an appeal from the decree of the Chancellor of the Pulaski Circuit Court.

The facts embraced in the case, are these: Richard C. Byrd purchased at public sale, and paid $401 00 for lots Nos. 4, 5 and 6, in Block No. 2, situate in the city of Little Rock, East of the Quapaw line, in the county of Pulaski, known as Gov. Pope's

addition to said city, and received therefor a certificate of purchase dated 19th November, 1833. This certificate of purchase he assigned and transferred to his son, Wm. J. Byrd, and requested the deed should be made to him. On 3d of March, 1835, in accordance with the assignment of the certificate, Gov. Pope executed a deed to these lots to Wm. J., being then a minor. Afterwards, Wm. J. Byrd, being the undisputed owner of lots Nos. 1, 2, and 3, in the same block, Richard C. Byrd erected thereon a large tavern-house; also a large two story brick warehouse, on lot 4, and the east part of lot 5, worth at least $8,000. He also erected a large three story brick building for stores, on lot 6, and twelve feet on the west part of lot No. 5. On the 23d of February, 1838, Wm. J., still a minor, conveyed, by deed, to R. C. Byrd lot 6, and twelve feet off the west part of lot 5, for the consideration of $8,000, expended in building the ware-house and tavern. In the spring of 1843, Wm. J. arrived to the age of 21 years, and on the 13th of November, 1844, he confirmed, by deed, the deed of 1838.

On the 24th of June, 1840, Jones, Woodward & Co., obtained judgment against R. C. Byrd for the sum of $5,661 65, in the United States Circuit Court, upon which they sued out a writ of *fi. fa.*, dated 21st June, 1841, and it was levied by the marshal on lot 6, and 12 feet of the west part of lot 5, and it was offered for sale 27th November, 1841, and not sold for want of bidders. A writ of *sci. fi.*, to continue the lien of judgment, was sued out and served on R. C. Byrd, alone, on the 19th of May, 1843, and the judgment was revived on the 19th April, 1844. *Fi. fa.* issued 16th May, 1844, on which nothing was done. On the 2d Nov., 1844, a *ven. ex.* issued, and on 25th Nov., 1844, lot 6, and 12 feet of the west part of lot 5, was sold by the marshal, and purchased by Geo. C. Watkins, plaintiffs' attorney, for ten dollars, to whom the marshal executed deed therefor, properly acknowledged and recorded.

On the 10th of November, 1840, E. Pitman & Co., obtained two judgments against R. C. Byrd, amounting in the aggregate to about $5,000, in the Pulaski Circuit Court. On the first judg-

ment, stay of execution was entered of record for six months, and on the second judgment, for eighteen months. On .the first, _fi. fa._, issued 9th June, 1841, and levied on lot 6, and 12 feet of lot 5, which was appraised at $19,500, and not bringing two thirds of its value, was not sold. On the 31st December, 1842, a writ of ven. ex. issued, returnable March term, 1843, and which was returned 28th March, 1843, with the following endorsements thereon, "The sheriff of Pulaski county, is authorized to return this execution _unsatisfied_, as by agreement between plaintiff and ·defendant, Ashley and Watkins, attorneys for plaintiffs." "This execution is returned unsatified, as per order of plaintiff's attorney, hereon endorsed, James Lawson, jr., sheriff, by N. B. Thommasson, deputy." "Returned and filed, May 10th, 1843. H. .Haralson, Clerk."

On the second judgment, execution issued 7th February, 1843, returnable May, 1843, and was ordered by the attorney to be re-turned unsatisfied, the same day it issued, endorsed as the first, :and was returned and filed, 10th of May, 1843. On the 19th of ·October, 1843, writs of _sci. fa._, to continue the liens, were sued out, on both judgments, and served on R. C. Byrd, alone, and the judgments were revived on 10th of January, 1844. On the 1st November, 1844, _fi. fa._ issued on both judgments, and levied on lot 6, and 12 feet on the west part of lot 5, and sold 21st April, 1845, and bought by Geo. C. Watkins, the attorney, for $1001 00, for the use and benefit of the judgment creditors of said Byrd. For which he obtained the sheriff's deed, properly acknowledged and recorded.

. On the 20th May, 1842, Trapnall & Cocke obtained two judg-ments against Wm. J. Byrd, then a minor, for about $800 00. On the 25th June, 1842, _fi. fa._ issued on each, and returned _nulla bona._ _Fi. fa._ again issued, 25th February, 1845, and was levied on lot 4, and the east half of lot 5 and lot 6, and they were sold the 25th April, 1845, and purchased by F. W. Trapnall, for $225 00. For which he has the deed of the sheriff, properly ac- knowledged and recorded.

On the 20th of June, 1845, Trapnall and wife conveyed lot 4, and the east half of lot 5, to the Bank of the State of Arkansas. The United States recovered judgment against the Bank, in the United States Circuit Court, on the 25th of April, 1845, on which *fi. fa.* issued 1st November, 1845, and was levied on lots 4, 5, and 6, and they were sold 26th of April, 1846, and purchased by F. W. Trapnall, who received a deed from the Marshal therefor, properly acknowledged and recorded. Since the commencement of this suit, Trapnall has conveyed his interest to lot 6, and west part of lot 5, to Geo. C. Watkins.

On the 26th October, 1844, Watkins, as the attorney for Jones, Woodward & Co., E. Pitman & Co., Johnson & Duplain, and T. H. Hyde & Co., entered into an agreement with R. C. Byrd, by which he allowed or agreed to give $10,000 on their judgments, amounting in the aggregate to $17,000, for lot 6, and 12 feet off lot 5, provided Byrd would put the buildings thereon in good repair.

On the 5th of October, 1843, T. D. Merrick & Fenno moved into these buildings, having rented them from the Byrds. Two days after (7th October, 1843,) the buildings fell down. It was immediately repaired in part by Merrick & Fenno, and they continued to occupy the buildings under the Byrds.

On the 22d November, 1843, R. C. Byrd and William J. Byrd executed jointly a deed of trust, by which they mortgaged, to the Bank of the State of Arkansas, lots Nos. 1, 2, and 3, in said block No. 2, upon which said tavern is situated, the property of Wm. J. Byrd; also the said lots Nos. 4, 5, and 6, embracing the brick ware-house, and the three story brick store-house, to secure their joint note for about $13,000, executed for a debt originally contracted by R. C. Byrd, excepting about $1200 by Wm. J. The mortgage deed authorized the Bank to control, receive, and apply all the rents of said property, to the payment of this debt, due in nine annual installments, until full payment or sale of the mortgaged property, excepting seven or eight hundred dollars, to be applied in repairing the buildings.

On the 29th November, 1843, R. C. Byrd contracted in writing with the complainant Wassell, a carpenter, to cut the three story store-houses down to two storys, and completely repair them, for which he was to be paid the Cincinnati prices of 1819, with 20 · per cent. added. The complainant, Wassell, was to be paid $200 on the 1st of December, and $100 on the 20th of December, 1843. The old materials to be worked in when it could. When new materials were necessary, R. C. Byrd was to furnish them. When the work was completed, it was to be measured by some one chosen by Byrd and the complainant, or some one chosen by him. And when the repairs were done, according to the agreement, the rents, arising from said houses, were to be applied to the payment of said Wassell for the residue of his work, and to be considered as money belonging to said Wassell until his claim was settled. This contract was signed by Wassell and R. C. Byrd, but never recorded.

The Bank and William J. Byrd agreed, in writing, that the above contract between Wassell and R. C. Byrd, should be fully carried out, and that the rents arising from said store-houses should be applied in paying Wassell for said repairs according to their agreement. Which is signed by the agents of the Bank and Wm. J. Byrd, but not recorded.

On the 30th December, 1843, similar articles of agreement were entered into between Wassell and Wm. J. Byrd, to repair the ware-house on lot 4, and east part of lot 5, which was signed and sealed by Wassell and Wm. J., but not recorded. To which contract the Bank and R. C. Byrd agreed, in writing, and that, when completed, the rents arising from said ware-house, to the amount of $500, should be applied to the payment of said Wassell, for repairing it, which was signed by the agents of the Bank and R. C. Byrd, but not recorded.

Soon after this, Wassell commenced and continued repairing these houses, under these contracts, till July, 1845, being frequently hindered and delayed in the mean time for want of suitable materials, the Byrds having failed to furnish materials, as

they had contracted. On the 15th July, 1845, Wassell notified the Bank that he was ready to complete the contracts of repairing, according to the agreements, and requesting and requiring the Bank to furnish the necessary materials. The Bank immediately refused and denied being bound by the contracts. Whereupon, Wassell abandoned the contracts, and applied to the Byrds to appoint some person to measure the work he had done. The Byrds appointed one Shaw, a carpenter, who, together with the complainant, measured the work done on the store-houses, and found it to amount to the sum of $2,043 71, and the repairs on the ware-house to $569 82. A large number of other judgments were obtained against R. C. Byrd, in 1839, 1840, and 1841, amounting in the aggregate to more than $20,000, under some of which the store-houses on lot 6 and part of lot 5 were sold, and purchased by F. W. Trapnall, but they are not necessary to the decision in the case, and are omitted. On the 9th October, 1845, Wassell filed his lien on the property, in accordance with the statutes, crediting R. C. Byrd with $28 00, and Wm. J. Byrd with $50 00.

Wassell filed his bill on — August, 1846, to recover the rents of the property sufficient to satisfy his claim for repairs from Watkins and Trapnall, who were in the possession of the property. The Court decreed that the rents, sufficient to satisfy Wassell's claim for repairs, were a charge upon the property in the hands of Watkins and Trapnall, and that the complainant recover from Geo. C. Watkins $2,015 21, the amount then due for repairs on the brick store-house on lot 6 and 12 feet on lot 5. And further decreed that the complainant recover from F. W. Trapnall $500 on the amount then due, according to contract, for repairs on the brick ware-house, on lot 4 and the east part of lot 5.

In the investigation of this case, we have encountered many questions exceedingly intricate and perplexing. We shall not attempt to decide all the questions which may be raised by the facts, but such only as we think are necessarily involved in the correct determination of the case.

11BB

In the beginning, the legal question presents itself, whether the mortgage to the Bank, executed by R. C. Byrd and Wm. J. Byrd, the 22d November, 1843, after Wm. J. arrived to the age of 21 years, was an affirmance or disaffirmance of the deed of 1838.

The execution of the mortgage by Wm. J. Byrd *alone*, would, without doubt have been a disaffirmance of the deed of 1838. This would have been a *complete* assumption of ownership; a claim totally inconsistent and irreconcilable with the deed of 1838. But we think the mortgage in this case is *no* disaffirmance of the deed of 1838. The mortgage is *joint*—executed by R. C. and Wm. J. Byrd, and not Wm. J. alone. They *jointly* assumed the ownership of the lots mortgaged. They *jointly* entered into covenants of warranty and seizure. The instrument itself shows a *joint* responsibility. It is sufficient that if *all* the property mortgaged be vested in Wm. J. and R. C. Byrd to save them harmless from their covenants. It is not contended that R. C. Byrd had any title or claim to any of the property mortgaged, excepting that embraced in the deed of 1838. If he *intended* to disaffirm, why did he not execute the mortgage alone? Why did R. C. Byrd also execute the mortgage, and what is the legal effect as to him? Did he thereby assume the *complete* ownership of *all* the property? The instrument should be so construed, if possible, as to give it effect in all its parts, and as to all parties concerned, and carry out the true intentions of the parties. The legal effect of this mortgage does not imply an assumption of ownership of all the property by Wm. J. Byrd. This construction of the instrument accords with the assumption of ownership by R. C. Byrd of the property, in contracting with complainant for repairs, a few days after, which was assented to, and endorsed by Wm. J. Byrd, thereby admitting the ownership of his father; also with his subsequent deed of confirmation in 1844.

We are next led to inquire, what lien Wassell secured by his contract. It may be true that the *possession* of land, by virtue of a contract entitling to the immediate possession and rents,

would give a good lien, without being registered, against after acquired judgment liens and subsequent purchasers. Upon this, we are not now required to decide. It appears, from the record, Wassell never had the possession of this property. It is not even *contended* that he had a right to the possession and accruing rents by the terms of the contract, until he had abandoned it, on the 15th July, 1845, nearly two years after he entered into the contract with the Byrds. We think the contract between Wassell, the Byrds, and the Bank, clearly a mortgage upon the rents, to secure the debt for repairing the buildings, and comes within the registry act, and must be recorded to give a lien against a judgment creditor, who has acquired a *specific lien* by execution and levy, without notice of the mortgage. *Dig. of Ark.*, *p.* 745, *S.* 2, *Atwater vs. Mower*, 10 *Verm. R.* 75.

Wassell's contract with Wm. J. Byrd and the Bank, was executed on the 30th Dec., 1843. Trapnall & Cocke obtained their judgments against Wm. J. Byrd the 20th May, 1842. Execution issued, and was levied on the property on the 25th February, 1845, and it was sold on the 25th April, 1845, and Trapnall became the purchaser. The judgment liens being prior to Wassell's contract, and the judgments, executions, levy and sale being all within the three years, Trapnall, without doubt, obtained a good title to the property, unaffected by Wassell's claim. But the facts embraced in this branch of the case, present other questions more difficult and perplexing.

On 23d of April, 1845, the United States obtained judgment against the Bank. On 20th June, 1845, Trapnall and wife conveyed this property to the bank. On 1st November, 1845, *fi. fa.* issued and was levied on the same property, and it was sold 20th April, 1846, and Trapnall again became the purchaser. Did Trapnall's purchase and title under the prior judgment liens of Trapnall & Cocke, extinguish Wassell's lien on the property? Did the conveyance of this property to the Bank, by Trapnall and wife, revive the lien against the property, the Bank having notice and being a party to the contracted lien? Or what effect did they have, if any?

Again, it appears the United States had no notice of Wassell's unregistered mortgage or contract. Did the United States, by her judgment, *fi. fa.*, levy and sale of this property, acquire precedence over Wassell's unregistered lien? If so, did Trapnall, the purchaser at the marshal's sale, stand in the place of the United States, and get a good title, though he had notice of Wassell's contract? We do not now propose to decide all these questions, but such only as appear to be material and necessary to this case.

The doctrine seems to be well settled in New York and South Carolina, that the judgment lien is subject to every equity which existed against the land in the hands of the judgment debtor, at the time of the docketing of the judgment, though the judgment creditor *had no* notice at that time. That a court of chancery will protect the equitable rights of third persons against the legal lien, and will limit that lien to the actual interest which the judgment debtor has in the estate, and this is placed on the ground "that a judgment is *not* a *specific* lien on the land of the debtor, but a general lien on all the lands of the debtor." 1 *Paige R.* 128, *in the matter of Howe;* 4 *Paige R.* 15, *Keirsted vs. Avery.*

This case does not come within the principle here laid down. The *levy* of the *fi. fa.* gave the United States a *specific* lien on the property. The title of the Bank was thereby divested, and the United States became the legal owner *bona fide. (Cushing vs. Hurd*, 4 *Pick. R.* 255.) The lien of Wassell is therefore void as against the United States, because it was not recorded. If then Wassell's lien is void as against the United States, the doctrine of notice will not apply to Trapnall, for notice of that which is no lien, amounts to nothing. It seems further, if the United States were entitled to precedence, she has a right to the full benefit of her lien, without detriment from Wassell's unregistered mortgage, and Trapnall, by his purchase, is entitled to the benefits of the judgment lien.

But a different rule prevails in Pennsylvania and Ohio, and some of the other States. There, the judgment creditors are

placed on the same ground with *bona fide* purchasers, and the rule is, that every incumbrance, whether it be a registered deed or mortgage, or docketed judgment, should, in cases free from fraud, be satisfied according to priority of lien upon the record, which is open for public inspection."

4 *Kents Com.*, *p.* 173; *Cleveland Bank vs. Sterges*, 2 *McLean's R.* 341; *Cushing vs. Hard*, 4 *Pick. R.* 255; *Warden vs. Adams*, 15 *Mass. R.* 226; *Sigourney vs. Larned*, 10 *Pick. R.* 73; *Kanfelt vs. Bower*, 7 *Sergt. & Rawl. R.* 64; *Adams appeal*, 1 *Pa. R.* 448; *Bowers vs. Oyster*, 3 *Pa. R.* 240; *Coffin vs. Ray*, 1 *Met. R.* 212; *Johnson vs. Cawthorn*, 1 *Dev. & Battle R.* 32, 35, also 379; *Roberts vs. Rose*, 2 *Humph. R.* 145, 147; *Gunn vs. Chester*, 5 *Yerger R.* 205, 209. This seems to be the doctrine established by our Legislature in relation to the same subject. *The Dig. of Ark.*, *p.* 623, *S.* 5, regulating judgment liens, declares that liens shall commence on the day of the rendition " of the judgment and shall continue for three years." And the act concerning the registry of mortgages, *Dig. Arks.* 745, *S.* 2, provides that "every mortgage, whether for real or personal property, shall be a lien on the mortgaged property from the time the same is filed in the recorder's office for record, and not before ; which filing shall be notice to all persons of the existence of such mortgage." Here, we find the lien commences on the day of the rendition of the judgment, and the mortgage is a lien from the time it is filed in the recorder's office for record and not before. Priority must then be determined, from the time they were placed on the record. It is clear to our mind that, in the *absence of fraud*, the party first obtaining a record lien, in accordance with the statutes, obtains priority over unregistered mortgages, and entitled to prior satisfaction, according to the plain meaning of these provisions. Such is declared to be the law in Mississippi, under a similar statute to ours. *Benjamin vs. Hyatt*, 1 *Smedes & Marsh. Ch. R.* 437.

And they fully sustain the position above laid down, that liens on land, whether by judgment or mortgage, in the absence of

fraud, are to be discharged according to the order of time in which they respectively attached. And this is further evident from our statutes regulating conveyancing of real estate, (*Dig. of Ark., p.* 269, *S.* 31,) which provides that "no deed, bond, or instrument of writing for the conveyance of any real estate, or by which the title thereto may be affected in law or equity hereafter made or executed, shall be good and valid against a subsequent purchaser of such real estate for a valuable consideration without actual notice thereof; or against any creditor of the person, executing such deed, bond or instrument, obtaining a judgment or decree, (which by law may be a lien upon such real estate,) unless such deed, bond, or instrument, duly executed and acknowledged, or proved, as is or may be required by law, shall be filed for record in the office of the clerk, and ex-officio recorder of the county, where such real estate may be situated." Here, it is evident that creditors obtaining a judgment or decree, which by law is a lien upon the real estate, is placed on the same advantage ground with "subsequent purchasers for a valuable consideration without actual notice." Then, it being established that the judgment lien of the United States is entitled to priority over Wassell's lien, it clearly follows that Trapnall, the purchaser at sheriff's sale, under this judgment, cannot *be affected* by *notice* of the mortgage. "For, if he could, it would render the judgment unavailable." "It would give the mortgage priority over the judgment, and take away the value of the judgment to the amount of the mortgage." (*Jacques vs. Weeks,* 7 *Watts R.* 261.) And in *Bayley vs. Grienleaf,* 7 *Wheaton R.* 46, Chief Justice MARSHALL says, "to the world, the vendor appears to hold the estate, divested of any trust whatever, and credit is given to him in the confidence the property is his own in equity as well as law. A vendor, relying upon this lien, ought to reduce it to a mortgage, so as to give notice of it to the world. If he does not, he is in some degree accessory to the fraud committed on the public, by an act which exhibits the vendee as the complete owner of an estate, on which he claims a secret lien. It would

seem inconsistent with the principles of equity, and with the general spirit of our laws, that such a lien should be set up in a a court of chancery to the exclusion of *bona fide* creditors. The lien of the vendor, if in the nature of a trust, is a secret trust, and although to be preferred to any other subsequent equal equity, unconnected with a legal advantage, or equitable advantage, which gives a superior claim to the legal estate, will be postponed to a subsequent equal equity, connected with such advantage. In the United States, the claims of creditors stand on high ground. There is not perhaps a State in the Union, the laws of which do not make all conveyances, not recorded, and all secret trusts, void as to creditors, as well as subsequent purchasers, without notice."

We might well place this branch of the case on another ground. Admitting that Trapnall once knew of Wassell's mortgage on the rents of this property, he had no right to presume it remained unsatisfied. The circumstances of Wm. J. Byrd, the two subsisting unsatisfied judgment liens of Trapnall & Cocke, against him at the time of the contract, were sufficient, we think, to prompt Wassell to diligence in securing his lien, by having it registered. More than a year after the contract, Trapnall & Cocke sells the property, under their judgment liens, and more than two years after, the United States sells it again, as the property of the Bank. In the meantime, Wassell sets up no claim, interposes no objections to the sales, has taken no steps to have his mortgage lien recorded, as required by the statutes, nor assigned any reason for not doing so. We think, therefore, that Trapnall might well presume, from these circumstances, and from the length of time the mortgage remained unrecorded, and still being unrecorded, that it had been *satisfied* or *cancelled*, and *other security* taken, or that he had *waived* his lien. (*Farnsworth vs. Childs*, 4 *Mass. R.* 640.) If Wassell, in consequence, has to suffer, it is owing to his own *negligence*. He can blame no one but himself.

As to the other branch of this case, it depends somewhat upon

different principles. On the judgments of Jones, Woodward & Co., and E. Pitman & Co., *sci. fas.* to continue the liens issued within the three years, but the judgments of revival were not rendered until after the expiration of the three years. In the meantime, between the issuing of the *sci. fas.* and the revivals of the judgments, Byrd mortgaged the property to the Bank, and made this contract with Wassell for repairs, giving a lien upon the rents of the property. The question is, was there a *lapse* in the lien, so as to admit of the intervening equities of Wassell and the Bank. The principle involved in this question, we think, is well settled in *Trapnall vs. Richardson, Waterman & Co.,* 13 *Ark. R.* Where *sci. fa.* is issued before the expiration of the three years, and the judgment of revival is not entered until after, the judgment relates back to the date of the *sci. fa.* and the lien is continued unbroken. After the revival, the judgment creditor can sell and have the full benefit of his lien, without *lapse.* The case of *Whiting & Slark vs. Beebe,* is not inconsistent with the doctrine here laid down. In that case, the judgment creditor sold the property pending the sci. fa. before the judgment of revival was entered. His lien was incomplete without judgment of revival, and in that case the purchaser could not avail himself of its benefits.

The cases cited of *dormant* executions against personal property, do not, we think, apply. By our statutes, the liens in this case are attached to the judgments. They commenced with the judgments, and by *sci. fas.,* and judgments of revival are made to continue three years more from the dates of the *sci. fas.* "In those cases cited, the lien is not created by the judgment, or any matter of record." "A statutory lien is as binding as a mortgage, and has the same capacity to hold the land, so long as the statute preserves it in force." *Rankin & Schatzell vs. Scott,* 12 *Wheaton R.* 177; 6 *Condensed R. S. C. U. S.* 506.

There is no such delay, under the circumstances, in the case of Jones, Woodward & Co., as will postpone them, either in law or equity, and in view of all the circumstances in this case, we do

not attach much importance to the endorsements on the two executions of E. Pitman & Co., directing the sheriff to return the executions *unsatisfied*. These executions, with these endorsements, were returned, filed and made a matter of record, 10th May, 1843. And on the 19th October, 1843, *sci. fas.* to continue the liens, were sued out on both these judgments. There is no evidence that any agreement for delay existed at the time Wassell took the mortgage upon the rents of this property. We, therefore, think the complainant could not have been misled or defrauded, or in any way injured, by these endorsements or agreements. It is a general rule that "equity follows the law," and the special circumstances in this case are not such as to make this an exception. We think Wassell is entitled to the rents of so much of the brick ware-house as is or may be situated on the 13 feet lying between the east half and the 12 feet on the west part of lot 5, which still remains unsold. But, as the case now stands, there is no evidence on the record showing what part of said buildings, if any, are on the 13 feet, nor what amount of rents has been received thereon.

And if Watkins, after he purchased the property and obtained title thereto, stood by and silently permitted the complainant to bestow his labor upon the buildings, in ignorance of his superior title to the property, or upon the faith that Watkins would pay him for his labor, in that case Wassell is entitled to recover for all the labor he did upon the buildings *after* that period until he abandoned the works, or Watkins notified him of his superior title, and that he would not pay him. But, as the record now exists, there is no satisfactory evidence before us on these points, neither as to the amount of labor done on the buildings after this period, nor as to the value of such labor.

Mr. Justice WALKER delivered the opinion of the Court.

The grounds for equitable relief against the defendants, are in many respects essentially different, and for that reason will be considered separately.

12BB

And first, as regards the complaint against the defendant Watkins. It is predicated upon a contract made between the complainant of the one part, Byrd and the State Bank of the other, by which they granted to the complainant the rents and profits of certain buildings, for repairs to be made by Wassell (the complainant) on said buildings. The precise terms of this agreement, as between these parties, it is not important to examine, because the defendant, Watkins, claims the property by purchase, under a judgment lien, prior in point of time to the contract with Byrd and the Bank, to whom the property had been mortgaged, which is apparent upon the record, and admitted by the complainant, who contends that by the acts and conduct of the judgment creditor, his judgment lien had been, before the sale of the property, displaced. After a careful examination of the record, and the evidence, we are led to a different conclusion. The statute continues the lien of the judgment creditor for three years, unless displaced by some act of the party. Mere delay to sue out process within the time, would not of itself be sufficient for that purpose; nor would the levying of process, and an order by the creditor, or his attorney, to return the process, without selling the property, or to return process before it had been levied, necessarily discharge the judgment lien. Such acts do not amount to an abandonment of the lien, a release of property taken in execution, or a new or additional security. It is very true that in this case there was an apparent unnecessary delay in the sale of the property, and some vacillation in ordering process to issue, and thereafter to be returned. But upon looking to the peculiar circumstances of this case, it is evident that no sale of the property could have been made at an earlier day than that on which the sale took place, without hazarding the loss of the debt; because, as the defendant held the property by deed from a minor, until such minor became of age and affirmed the title so made, no one would have been safe in buying the property; and that this was the true cause of the delay, may be fairly inferred from the fact that the affirmance was procured to be made

by the plaintiff's attorney, and the sale of the property thereafter made with the least possible delay. It is also true that Wassell was, during the time of this delay, bestowing his labor upon the property, and thereby enhancing its value, and he may have been induced to prosecute his labors, under the impression that he could realize, out of the rents, a sum sufficient to pay for the repairs, before the property was disposed of. But there is no evidence that Watkins held out any inducements or assurance, to Wassell, that he would pay for the work, or that his (Wassell's) was the better claim, and although he knew Wassell was at work on the building, and had information with regard to the nature of the contract under which it was done, to put him upon inquiry, yet it must be remembered that Watkins, although the attorney for the plaintiffs, was not then the owner of the property, nor had he any control of it whatever, and was not, therefore, compelled to give notice to Wassell that he would not pay for improvements. In view of all the facts of the case, there can be no doubt of the superior title of Watkins to the property, free from all incumbrance, up to the time of purchase. But, after the purchase of Watkins, the property being his, a silent acquiescence, on his part, in the continuance of the work, by Wassell, upon the building, raised an implied assumpsit on his part to pay for the work so done. If he did not intend to pay Wassell for the work done on the building after his purchase, it was his duty at once to have apprized him of the facts; having failed to do so for a considerable length of time, the work done between the date of the purchase and the time when Wassell was notified, that Watkins would not be held responsible for the payment of the work, should be accounted for by Watkins.

Trapnall, like Watkins, in the first instance, purchased under a judgment lien, prior in time to Wassell's contract with Wm. J. Byrd and the bank, for repairs to the property, purchased by him, but, as he subsequently parted with his title to the Bank, he must rely for title solely upon his subsequent purchase, made under a judgment in favor of the United States against the Bank,

which was rendered subsequent to Wassell's contract, and consequently the lien created thereby laid hold of the lots as the property of the Bank, subject to all prior incumbrances.

It is a matter of some difficulty to determine satisfactorily the nature of this incumbrance. Wm. J. Byrd, prior to his contract with Wassell, conveyed the lots to the Bank, to secure the payment of certain debts. Upon the lots was situated a ware-house, that had partly fallen down, and was in a ruinous condition, and no doubt, with a view to having them repaired, made a reservation, that part of the rents and profits of the ware-house might be applied to the payment for repairs. This reservation, in view of the insolvent circumstances of Byrd, and the nature of the deed executed to the Bank, seems to have been a means of payment, for repairs, provided by the parties for their mutual benefit; because, by the terms of the deed of mortgage, there was not only a lien created upon the realty, but by express terms, a grant of the rents and profits, arising therefrom, to be applied to the payment of Byrd's debt to the Bank. The Bank was, therefore, interested in having the repairs made, that the property might be put in a condition to rent, and Byrd, for the same reason, and that it might be preserved from utter loss and ruin.

The contract for repairs was made by and between Wm. J. Byrd and Wassell, and on the same day approved, adopted and affirmed by the Bank, whereby it became the contract of both Byrd and the Bank; by the terms of which, it was agreed that five hundred dollars of the rents and profits arising from the use and occupation of the buildings, should be applied to the purpose of securing to Wassell his pay for repairs to the buildings.

In view of all the circumstances connected with this transaction, it is evident that Wassell, to the extent of five hundred dollars, contracted for these rents, as the consideration for the repairs. Byrd was not to pay this sum in any event, because the amount to be paid by him was expressly agreed upon; to that extent, the contract was made on the personal responsibility of Byrd, but it was the interest in the property granted, which was set apart by

Byrd and the Bank, and contracted to Wassell, and accepted by him as a payment for the work to be done. It was not, therefore, a mere security for the payment of Byrd's contracts, but upon the adoption of the contract, by the Bank, it was, in effect, a transfer to Wassell of the rents and profits in payment for his services, and when it is considered that Byrd had, in express terms limited his personal liability, and apart from such liability, had contracted the rents which had, by the terms of the deed of mortgage, been reserved for the express purpose of paying for the repairs, which contract was affirmed by the Bank, it is equally clear that the Bank was only fulfilling her agreement with Byrd by joining him in making the transfer, and was not liable as a corporation in any event upon the contract. It was then a grant of rents, an incorporeal hereditament, which, as incident to the purchase, he might demand and receive, and, for the purpose of enabling himself to do so, if necessary, might enter upon the realty, because the grant of the rents carried with it every incidental right necessary to enable the purchaser to get the benefit of his purchase.

We have seen that, by the express terms of the deed of mortgage, the rents were conveyed to the Bank, with the reservation that part thereof should be applied to paying for repairs, or, if not, as Byrd and the Bank both executed the contract with Wassell, he certainly acquired the title to the rents, whether in either or both of them. If, however, the title or interest in the Bank was imperfect, for the reason that there was an equity of redemption as to the realty, and, therefore, that she did not communicate or pass to Wassell a perfect title to the rents by reason thereof; still, her subsequent purchase of the property from Trapnall was, in effect, an affirmance of a perfect title in Wassell, under his purchase of the Bank, as fully and to the same extent that it came to her from Trapnall, for it is a familiar and well established rule in this State, that if one sells real estate to which he has no title, or an imperfect title, at the time of the sale, and subsequently acquires such perfect title, that such title enures to the benefit of

his vendee as fully as if the after acquired title had existed in the vendor at the time of his conveyance in the first instance.

At the time the United States obtained judgment against the Bank, she evidently had no estate or interest in the realty or in the rents and profits arising therefrom; because, before that time, the property had been sold to Trapnall, under process, to satisfy a judgment against Byrd, who held the equity of redemption, and as the judgment lien was older than the deed of mortgage, the whole legal estate vested in the purchaser. But upon the transfer made subsequently to the Bank, the judgment lien did attach, and held the estate as perfectly and to the same extent, that it remained in the Bank after her purchase.

We have seen that the rents and profits had been, by the Bank, conveyed to Wassell, and that her purchase of Trapnall, to the extent of her former transfer to Wassell, passed immediately to him. So that the title, which the Bank really acquired by her purchase of Trapnall, was, at the time the lien took effect, encumbered with this prior conveyance.

The office of a lien is not to create an estate, nor in the slightest degree to affect or interfere with prior incumbrances, but to prevent subsequent alienations or incumbrances. So, it was said, in *Kersland vs. Avery*, 4 *Paige* 14, " The lien of the judgment is subject to every equity that existed against the land in the hands of the debtor, at the time of docketing the judgment, and the court of chancery will protect the equitable rights of third persons against the legal lien, and will limit that lien to the actual interest which the judgment debtor has in the estate." In *Mooney vs. Dorsey*, 7 *Sm. & Mar. R.*, *p.* 22, the court of appeals of Mississippi say, "The lien of the judgment can only operate upon the interest which the debtor had at the time of its rendition." In Adams' Doctrine of Equity, page 311, it is said, "The judgment creditor is entitled to the debtor's real interest, alone subject to his equities as they existed at the date of the judgments." And Chancellor Kent, 4 *Kent's Com.* 437, says, " After all, the lien amounts to but a security against subsequent purcha-

sers and incumbrancers." In *White & Tudor's Equity Cases,* *vol.* 2, *p.* 107, numerous adjudged cases are cited to the effect "that a judgment lien is not to be regarded in the light of a purchase, or as entitling the creditor to the preference over prior equities, and unrecorded deeds." We think these authorities will sustain the position assumed, that the interests of the creditor in the real estate of the debtor, is limited to the actual interest of the debtor at the time the lien attaches, and he holds it free from subsequent alienations or incumbrances, but subject to prior alienations or incumbrances.

Turning to the facts of the case, there can be no doubt but that Trapnall was, even prior to his first purchase, under the Trapnall & Cocke judgment, informed of the nature of Wassell's interest in this property, and the terms of his contract with Byrd and the Bank; he admits, in his answer, that he had notice sufficient to put him upon inquiry, and he well knew at the time of his purchase, under the United States judgment, that Wassell had nearly or quite completed the work on the ware-house. Trapnall was the owner of the property whilst the work was progressing from the time of his prior purchase until his sale to the Bank, and must have been well acquainted with all that related to Wassell's claim; for, during the time, Wassell was engaged in making the repairs, he had been judgment creditor, attorney, purchaser, vendor and purchaser again; he resided in the same city, where the property was situated, and the work was done. From all these considerations, as well as from the evidence, and his own admissions, he well knew all the facts of the case, and being an eminent attorney, he also knew the nature of the incumbrance on the property when he bought it. There can be no hardship then in holding his purchase subject to Wassell's prior equity; because we must presume that, with a knowledge of the facts and of the law, he bought the property with an eye to Wassell's claim, and bid for it, less than he would otherwise have done, by the amount due Wassell, so that in fact he loses

nothing by paying this sum. Or, if otherwise, knowing the facts, he bought at his peril, and must be held to account.

The report of the master, sustained by the evidence, shows that, clear of all expenses for repairs since he took possession of the property, he has received exceeding $500, the sum due Wassel, which sum was, by the Circuit Court, decreed to the complainant; and, under all the circumstances of the case, we think the claim of the complainant of a highly equitable character, well sustained by the evidence, and, so far as regards the claim against Trapnall, the decree ought to be affirmed.

But, so far as the decree goes to charge Watkins with the value of the repairs made upon the buildings, purchased by him, prior to his purchase, we think the Circuit Court erred, and, for this error the decree, as to him, must be set aside; and, as Watkins is properly chargeable with the value of the work done upon the buildings, after he purchased the same, and before Wassell was notified by him that he would not be responsible for repairs, and inasmuch as we cannot readily ascertain from the evidence what amount of work was done, after such purchase and before such notice, the case must be remanded, with instructions to the Circuit Court, by reference to the Master or otherwise, according to the practice in said Court, to ascertain the amount of work so done, and the actual value thereof, and to render a decree in favor of the complainant for the same.

Hon. Chief Justice WATKINS not sitting.